Scott, J.
By the 29th section of the 2d article of the constitution of this State it is declared as follows:
“No extra compensation shall be made to any officer, public agent, or contractor, after the service shall have been rendered or the contract entered intonor shall any money be paid on any claim, the subject-matter of which shall not have been provided for by pre-existing law, unless such compensation or claim be allowed by two-thirds of the members elected to each branch of the general assembly.”
Applying this section of the constitirtion to the present case, two questions arise upon the pleadings. Eirst: Is the claim of the plaintiff, the payment of which is sought to be enforced by this proceeding, one, the subject-matter of which was provided for by pre-existing law? And if not, then,, secondly: Has it been allowed by two-thirds of the members elected to each branch of the general assembly ? If either of these questions can be properly answered in the affirmative, the plaintiff would seem to be entitled to a peremptory writ of mandamus; but if both questions must be answered in the negative, his application must be refused.
*14 The language of the latter part of the section of the constitution which we have quoted seems to be plain and explicit ; leaving little room for interpretation or construction. It clearly prohibits the payment of any money “on any •claim, the subject-matter of which shall not have been provided for by pre-existing law, unless,” etc. We see no reason for interpreting this language in any other sense than that which lies upon the surface, and which the terms used naturally import. In such a sense we may assume that it was understood by the body of the people, through whose votes it became a part of the constitution.
In its ordinary sense, a claim imports the assertion, demand, or challenge, of something as a right, or it means the thing thus demanded or challenged. The word, as here used, is by implication limited to claims against the State, and of a pecuniary character. The inhibition is against the payment of any money on any claim, etc. Claims for the payment of money may be preferred against the State on various grounds. They may be either of a legal or of an equitable character. They may purport to arise under existing laws; or to originate in circumstances which are supposed to cast upon the State a duty, either of perfect or imperfect obligation, to provide for their payment. All such demands against the State for the payment of money, whatever be their character or origin, are, we think, claims within the meaning of the constitution. The prohibition of payment is limited, however, to claims, “the subject-matter of which shall not have been provided for by pre-existing law.” By the subject-matter of a claim, we understand the facts or circumstances out of which the claim arises, or by reason of which the supposed right accrues to the claimant to demand and receive money from the State.
What, then, is the subject-matter of the plaintiff’s claim in this case? His petition fully answers this question. It refers to the act of March 30,1864, passed by the general assembly of this State, “ To provide for the appointment of commissioners to examine claims growing out of the Morgan raid, and prescribing their duties.” He states that he exhib *15 ited to the commissioners appointed under said act, a claim against the State for damages occasioned to him by said raid, in the burning of his warehouse and property situated therein, and in the loss of a large quantity of tobacco and other property, taken or destroyed by the rebel forces, at the time of said Morgan raid through Ohio, in 1863. He alleges that his said claim was examined and allowed by said commissioners, to the amount of $4,366, and that its payment has been authorized and provided for by subsequent legislation.
The subject-matter of his claim, then, clearly is the damages occasioned to him by the rebel forces engaged in the Morgan raid through Ohio, in 1863. And the question is, had this subject-matter, that is, these damages thus occasioned, been provided for by pre-existing law? In other words, at and prior to the time when the acts were done which caused these damages, was there a subsisting law which authorized their payment by the State ?
The answer of the defendant avers, and the demurrer of the plaintiff admits, that no such law then existed.
"Were the plaintiff claiming compensation, or payment for property taken by the State for public use, the case would be quite different. The subject-matter of such claims is provided for by pre-existing law, even by the constitution itself, which requires compensation in money to be made in such case, to the owner. It would no doubt be competent for the legislature to provide by law for the payment by the State of damages done to private property by mobs, by insurrectionary violence, or by public enemies. Cases arising under such general laws would not fall within the class of claims against which this section of the constitution was intended to guard, for their subject-matter would then be provided for by preexisting law. But no such general law, providing for the plaintiff’s case, has ever been enacted in this State. The policy here, as well as elsewhere, has always been to make the prompt suppression of violence, and the repulse of the public enemies, a matter of vital interest to the owners of property; and thus insure their earnest co-operation with the government in its efforts for the common defence and public safety. *16 And where the character of a claim is such that sound policy would prohibit the recognition of its justice by previous legislation, there we think the constitution intended to prohibit its payment under subsequent legislation, unless its justice- and merits were such as to secure its allowance by the concurrent votes of two-thirds of the members elected to each, branch of the general assembly.
It is argued by counsel for plaintiff that as the State was-under no obligation to compensate the plaintiff for the destruction of his property, therefore this is not the case of a. claim within the meaning of the constitution. But it would be strange indeed if this constitutional provision was intended to guard the treasury only against claims which the State-would be under obligation to pay, and to provide no safeguards against claims sustained by no such obligations.
We see no room for doubt that the plaintiff’s claim is shown. by the pleadings to be one for which no warrant can legally be drawn upon the treasury, unless its payment has been authorized by two-thirds of the members elected to each-branch of the general assembly. Has this been done 1
The only acts of the legislature which the plaintiff sets xrp,, as an allowance of his claim, are the act of April 30, 1869, “ To provide for the payment of claims for damages growing out of the military expedition of John H. Morgan in the State-of Ohio, a.d. 1863,” and the act of May 5th, 1869, “making appropriations for the year 1869, and the first quarter of' 1870.” By the latter act he claims moneys were appropriated for the payment of the Morgan-raid claims, including, the one which is here set up. The answer of the defendant avers that neither of these acts were voted for by two-thirds-of the members elected to either branch of the general assembly, as appears by the journals of the respective houses; and that plaintiff’s claim has therefore never been allowed by any valid enactment. The plaintiff’s demurrer admits the truth of this averment, provided the journals of the respective houses may be examined for the purpose of ascertaining the state of the vote upon the alleged passage of' a bill. That these journals are the proper evidence as to the- *17 state of tbe vote, on tbe passage of a bill, we entertain no doubt. The 9th section of the 2d article of the constitution requires each house to keep a correct journal of its proceedings, which shall be published; and it also requires that, on the passage of every bill, in either house, the vote shall be taken by yeas and nays, and entered upon the journal; and provides that no law shall be passed in either house, without the concurrence of a majority of all the members elected thereto. This entering of the yeas and nays upon the journal must have been intended to furnish the permanent evidence of the state of the vote so recorded. In Miller & Gibson v. The State, 3 Ohio St. 475, it was said: “No bill can become a law without receiving the number of votes required by the constitution. And if it were found, by an inspection of the legislative journals, that what purports to be a law upon the statute book was not passed by the requisite number of votes, it might possibly be the duty of the courts to treat it as a nullity.” The case then before the court did not require-a decision of the question now made. It was assumed, for the proposes of that case, that the legislative journals were the appropriate evidence on the question whether a bill had been passed by the constitutional number of votes. And were we to hold otherwise, we would in effect hold that a. bill may become a law without receiving the number of votes required by the constitution; that a single presiding officer may by his signature give the force of law to a bill which the journal of the body over which he presides, and which is kept under the supervision of the whole body, shows, not to have been voted for by the constitutional number of members. The plain provisions of the constitution are not to be thus nullified, and the evidence which it requires to be kept under the supervision of the collective body, must control, when a question arises as to the due passage of a bill.

Mandamus refused.

Beinkeehofe, C.J., and Welch, White, and Day, JJ., concurred.